UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:11-cr-00053-JAW |
| | ) | |
| KEVIN EARL SPRING | ) | |

**ORDER ON THIRD MOTION FOR ACQUITTAL**

On December 15, 2011, the Court in a bench trial found Kevin Earl Spring, who had previously been involuntarily admitted to a mental health institution under 34-B M.R.S. § 3863, a provision of Maine law, guilty of making a false statement in connection with the acquisition of a firearm in violation of 18 U.S.C. § 922(a)(6) and making a false statement during the purchase of a firearm in violation of 18 U.S.C. § 924(a)(1)(A) based on his statements on an ATF Form that he had not previously been involuntarily committed to a mental health institution.[1] On January 13, 2012, after conviction but before sentencing, the First Circuit issued *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012), overruling *United States v. Chamberlain*, 159 F.3d 656 (1st Cir. 1998), and holding that an involuntary emergency psychiatric admission under 34-B M.R.S. § 3863 does not constitute a

---

[1] A number of provisions in Title 18 cover the making of a false statement in the acquisition of a firearm. The Indictment charged Mr. Spring in Count One with a violation of 18 U.S.C. § 922(a)(6), making a false statement in connection with the acquisition of a firearm, and in Count Two with a violation of 18 U.S.C. § 924(a)(1)(A), making a false statement during the purchase of a firearm. *Indictment* (Docket # 57). The Indictment charged the same false statement in both Counts One and Two, namely that Mr. Spring falsely denied he had been involuntarily committed to a mental institution. *Id.*

commitment under 18 U.S.C. § 922(g)(4).² At trial, Mr. Spring was also convicted of a third count, possession of a firearm by a prohibited person. Because, in the wake of *Rehlander*, Mr. Spring's emergency admission in Maine did not constitute a commitment, the Government promptly dismissed Count III, the possession charge. However, the Government has not moved to dismiss Counts I and II, the false statement convictions, contending instead that the crime of making a false statement must be measured by the law in effect at the time of the statement and the crime was complete when Mr. Spring's statement, which was then false, was made. Citing *Rehlander*, Mr. Spring has moved for acquittal.

In *Rehlander*, the First Circuit predicted that "[c]omplications may result, in relation to prior convictions of others based on *Chamberlain*," but explained that "the problems will be resolved if and as they are presented." 666 F.3d at 51. This case presents such a problem. The question is whether *Rehlander* mandates acquittal of a defendant convicted of violating 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A) based on *Chamberlain* but not yet sentenced. With considerable hesitation, the Court concludes that the convictions must not stand.

I.   STATEMENT OF FACTS

   A.   The Case Pre-*Rehlander*

Based on the law before *Rehlander*, the Government presented an especially compelling case against Kevin Earl Spring. In December 2010, Mr. Spring was living in his house in Owl's Head, Maine when he began to act oddly. Believing that

---

²     The First Circuit's opinion in *Rehlander* addressed the involuntary commitment underlying Mr. Spring's statements leading to the false statement charges in both Counts.

neighborhood teenagers had entered his home by a secret entrance to steal his copper piping, he boarded up some of the windows in his house and stood guard. After Mr. Spring called his neighbors, asking them for help in fending off people who were supposedly trying to enter Mr. Spring's house, and after they saw him with a gun, the neighbors called the police.

When the police arrived on December 29, 2010, Mr. Spring was visibly agitated and disheveled, but he let them in.  He told the police that people were trying to break into his house and steal from him.  He claimed that they had taken his furnace and copper piping and pointed to what he termed a "secret entrance" on the floor, which was secured by a piece of plywood.  The police inspected his house and found no evidence of forced or secret entry.  Upstairs in Mr. Spring's bedroom, however, they found a loaded bolt-action shotgun with a round in the chamber and three rounds in the clip.

The police told Mr. Spring that they were concerned about his mental health and intended to take him to the hospital for evaluation.  Mr. Spring did not like the idea because he was worried that in his absence, the house would be broken into, but he was cooperative.  The police told him he had no choice and they intended to take him to the hospital.  Placing his shotgun in the trunk of the cruiser, the police placed Mr. Spring in the back seat of the cruiser and took him to the local hospital for evaluation.

At PenBay Medical Center, Mr. Spring was evaluated by Dr. James Curtis, an emergency room physician.  Mr. Spring told the doctor that the night before, he

had heard people sawing his copper pipes all night long. He also told the doctor that there is a secret passageway that leads to his basement and these young adults had found the passageway. The doctor checked with police and they confirmed they had found no evidence that any teenagers had entered the home and no secret passageway. After completing his examination of Mr. Spring, Dr. Curtis completed an Application for Emergency Involuntary Admission to a Mental Hospital, certifying that Mr. Spring had a mental illness that caused a substantial risk of harm to others. On December 30, 2010, pursuant to 34-B M.R.S. § 3863, a justice of the peace approved the application for emergency involuntarily admission.

During his admission to the psychiatric ward of the hospital, Mr. Spring was seen by Dr. Van Lonkhuyzen, a PenBay psychiatrist. Dr. Lonkhuyzen confirmed the need for hospitalization based on his view that Mr. Spring was suffering from a form of psychosis and represented a danger because of the loaded gun. Dr. Lonkhuyzen said that Mr. Spring asked to be released but the doctor had told him that he was being held involuntarily. At one point, Mr. Spring threatened to contact the American Civil Liberties Union and to sue the police on the ground that he had been illegally transported to PenBay. Under 34-B M.R.S. § 3863(5-A)(C), a hospital is not allowed to involuntarily detain a person who has been involuntarily admitted on an emergency basis beyond three days. However, Mr. Spring agreed to remain in the psychiatric unit until January 4, 2011, when he was discharged.

On January 26, 2011, Mr. Spring began to look for a gun. He traveled to a gun dealer in Vassalboro, Maine and expressed interest in attending a basic

4

handgun course, which is a requirement for obtaining a concealed gun permit. The gun dealer, Charles Cabaniss, testified that Mr. Spring appeared extremely agitated. He said that Mr. Spring told him that he needed the gun because people were breaking into his house and stealing copper and he wanted a gun to protect himself. Mr. Spring showed Mr. Cabaniss a photograph of his basement and asked Mr. Cabaniss if he could see a person in the photograph. Mr. Cabaniss could not see anyone in the photograph.

Mr. Spring expressed an interest in purchasing either a revolver or a handgun. The gun dealer, however, was extremely concerned about whether Mr. Spring was in his right mind and had Mr. Spring fill out the top part of ATF Form 4473 to obtain identifying information about him. Mr. Cabaniss directly asked Mr. Spring whether he had ever been committed to a mental institution and Mr. Spring stumbled, telling Mr. Cabaniss that his lawyer would take care of all of this. Mr. Cabaniss informed Mr. Spring that anyone who had been involuntarily placed in a mental institution was prohibited from purchasing a firearm and Mr. Cabaniss told Mr. Spring that he needed to do some research to determine whether he could sell him a firearm. Mr. Spring left. Mr. Cabaniss was so concerned about Mr. Spring that he emailed an ATF agent about him and later emailed a deputy sheriff, raising concerns about Mr. Spring's mental state and his interest in purchasing a firearm.

The next day, on January 27, 2011, despite the fact that Ellsworth is a considerable distance from Rockland, Mr. Spring drove to Ellsworth, Maine to purchase a firearm. Mr. Spring went to a firearms dealer in Ellsworth and told the

5

dealer that the reason he wanted to buy a gun was that people were after him and his property and that he was in fear of his life. He focused on a 9mm Glock handgun, completed and signed a Form 4473 in which he denied that he had ever been committed to a mental institution, and paid for the firearm. The actual sale of the Glock was delayed by the National Instant Criminal Background Check System.

At his trial, Mr. Spring did not testify but he presented a strong argument that a reasonable person would not construe an involuntary emergency psychiatric admission under 34-B M.R.S. § 3863 as an involuntary commitment within the language of the ATF form. His argument was weakened, however, by his own actions. Something out of the ordinary had taken place on December 29-30, 2010, when he had been taken by the police against his will to the mental health ward of a hospital and held there against his will. Furthermore, Mr. Spring was clearly placed on notice by the first dealer that he probably was prohibited from purchasing a firearm but, the next day, he drove miles away from his home and purchased a gun from a second dealer without revealing his prior involuntary admission on the required forms and without confirming whether he was prohibited from possessing a firearm under then current law.

Mr. Spring's defense foundered on clear and unequivocal First Circuit precedent. *See United States v. Chamberlain*, 159 F.3d 656, 665 (1st Cir. 1998) (concluding "that a five-day emergency detention [under 34-B M.R.S. § 3863] is a 'commitment'" for purposes of the Gun Control Act); *see also United States v. Holt*, 464 F.3d 101, 105 (1st Cir. 2006) ("the [*Chamberlain*] court held that the five-day

detention was a 'commitment,' concluding that the substance of the mental institute admission procedures, rather than the label of the procedures as a 'commitment,' is controlling for the federal statute"); *United States v. Small*, No. CR-09-184-B-W, 2010 U.S. Dist. LEXIS 13698, at *5 (D. Me. Feb. 16, 2010) (noting that "ordinary meaning, First Circuit precedent, and statutory context provided ample notice that emergency hospitalization under Maine law qualified as committed under § 922(g)(4)") (internal punctuation omitted). Applying *Chamberlain* and its progeny to these facts, the Court found Mr. Spring guilty of two counts of making a false statement in connection with the acquisition of a firearm in violation of 18 U.S.C. § 922(a)(6).

### B.     The Case Post-*Rehlander*

On January 13, 2012, the First Circuit reversed *Chamberlain*. *See Rehlander*, 666 F.3d 45, 50-51 ("[t]he district court cannot be faulted for following *Chamberlain*, but the panel is constrained to abandon that decision"). The First Circuit stated:

> As we read section 922 in light of the concerns already discussed, a temporary hospitalization under section 3863 does not constitute a "commitment" under section 922—just as it clearly does not constitute a commitment under Maine law itself.

*Id.* at 50. Applying *Rehlander* to these facts, if Mr. Spring had attempted to purchase a firearm after that case was issued, the Court would have been compelled to acquit Mr. Spring because his answer to the ATF question about whether he had been previously involuntarily committed to a mental institution would no longer be false because his involuntary emergency psychiatric admission under 34-B M.R.S. §

7

3863 would not have constituted a commitment under 18 U.S.C. § 922. But because Mr. Spring made his statement on the ATF Form prior to the *Rehlander* change in law, the question becomes whether *Rehlander*'s ruling on what constitutes a "commitment" for purposes of the Gun Control Act alters Mr. Spring's false statement liability.

## II. THE PARTIES' POSITIONS

Mr. Spring argues that his statements were not false because his temporary hospitalization did not constitute a commitment under Maine law in light of *Rehlander*'s January, 2012 change in law. In his Reply, Mr. Spring contends that the Government's position is internally inconsistent:

> The government argues . . . that although Mr. Spring had never been involuntarily committed to a mental institution, and could lawfully possess a firearm, it was unlawful for him to tell a firearms dealer that he had never been involuntarily committed or to write that fact on a federal firearms form.

*Def.'s Reply* at 2.

The Government's response is that the timing of Mr. Spring's statement is instructive and that he "is not entitled to the benefit of a First Circuit decision issued a year after his false statement because the law governing commitments was different when he made the statement." *Gov't's Supp. Br.* at 1. To support its position that the verdicts on the false statement counts should be sustained, the Government refers to case law that has upheld firearms convictions based on false statements about underlying felony convictions that were later vacated.

### III. DISCUSSION

#### A. The Timing of False Statements

The closest analogue to Mr. Spring's false statement conviction is a series of cases involving convicted felons, whose disqualifying felony was valid as of the date of purchase but was later overturned. Courts have concluded that despite the later annulment of the person's felony, the applicant still owed a legal duty to be truthful as of the date of purchase and his later vindication did not affect his conviction for false statement. *See, e.g., Cassity v. United States*, 521 F.2d 1320, 1322 (6th Cir. 1975); *United States v. Graves*, 554 F.2d 65, 70-72 (3d Cir. 1977) (*en banc*); *United States v. Allen*, 556 F.2d 720, 722 (4th Cir. 1977); *United States v. Ransom*, 545 F.2d 481, 484 (5th Cir. 1977); *United States v. Edwards*, 568 F.2d 68, 70 (8th Cir. 1977); *United States v. Johnson*, 612 F.2d 305, 306 (7th Cir. 1980). Indeed, in 1981, the First Circuit affirmed without opinion a district court decision that arrived at the same result. *See United States v. Kozerski*, 518 F. Supp. 1082, 1092 (D.N.H. 1981), *aff'd* 740 F.2d 952 (1st Cir. 1984).

These cases show that a defendant who makes a false statement where the underlying prohibition later changes or is found to be invalid remains liable for the separate crime of making a false statement. *See, e.g., Graves*, 554 F.2d at 79 ("[w]e are satisfied that § 922(a)(6) compels disclosure of all convictions which have not been set aside, whether ultimately shown to have been valid or not" and that § 922(a)(6) "penalizes [a defendant] not for being a convicted felon, but for failing to tell the truth about the conviction"); *see also Cassity*, 521 F.2d at 1323 ("[w]e

9

conclude . . . that the careful statutory scheme of gun control Congress has provided *would be seriously jeopardized if a person convicted of a felony could, when purchasing a firearm, make the statement that he had never been convicted of such felony based upon his own subjective belief that his conviction was constitutionally defective where such conviction had not prior to been set aside*") (emphasis supplied). In other words, these cases represent the basic premise that false statement liability attaches where the statement was false when made, despite subsequent legal or factual developments that would counsel a different answer on a later date. By the same logic, Mr. Spring's false statement conviction does not penalize him or remove his individual right to bear arms for having been involuntarily admitted to a mental institution; it penalizes him for falsely reporting in January, 2011 that he was not a prohibited person when, at that time under governing law, he was.

In *United States v. Wright*, 537 F.2d 1144 (1st Cir. 1976), the First Circuit addressed the situation where a defendant thinks that he is or should be permitted to own a gun but as a matter of law is not, and nevertheless answers questions falsely on the federal ATF forms in order to obtain one. *Id.* at 1146. The *Wright* defendant had a previous felony conviction but possessed a state-issued firearm permit that he believed entitled him to own a gun; when filling out the required forms he represented he did not have a prior felony conviction. *See id.* at 1144-45. In *Wright*, the Court held that "[e]ven if he could be found to think that the state permit allowed him to purchase guns, he could not think that it permitted him to make 'false and fictitious statements' to the federal government, the offense with

which he is charged." *Id.* at 1146. The First Circuit went on to note that "[t]he most that could be said is that a belief on [the defendant]'s part that he had a right to purchase the gun bore on the recklessness vel non with which he signed the federal form." *Id.* (upholding false statement conviction based on reckless disregard).

At trial, Mr. Spring took a similar position: that he did not know his involuntary admission constituted a commitment, which is what the ATF form asks. However, the Court found that under the law as it existed at the time, he had been so committed when he tried to make the firearms purchases and that he had lied when he completed the forms. As several other Circuits have acknowledged, the underlying congressional intent in imposing false statement liability on federal firearm acquisition forms is to compel full and honest disclosure. *See Cassity*, 521 F.2d at 1323 ("[w]e think it apparent from the language employed that Congress intended to provide a scheme of regulation by compelling full and honest disclosure"); *see also Ransom*, 545 F.2d at 483-84 ("[w]e agree with the rationale of *Cassity*"). The plain fact is that Mr. Spring did not fully and honestly disclose his involuntary admission on the ATF forms, and his answer was false at the time he made it.

As Mr. Spring's statement on the forms that he had not been committed was false under the governing law, these cases support the conclusion that Mr. Spring is not permitted to avoid criminal liability for making a statement that was false when he made it, only because the First Circuit later changed its position as to the degree

11

of due process required under Maine state law before prohibited person status attaches. To allow individuals seeking firearms in the future to provide answers to these forms based on their "guesses" as to the state of the law in a week, a month, or a year would arguably run afoul of the purpose of these forms: to "compel[] full and honest disclosure" from persons seeking to purchase firearms. *Cassity*, 521 F.2d at 1323.

### B.   Retroactivity and *Rehlander*

Nevertheless, this is a hard case, and the Court is uneasy about finding Mr. Spring guilty for actions that under current law would not constitute a criminal offense. To be clear, its wariness is not because Mr. Spring was wrongfully convicted under the law as it stood as of the date of his offenses or as of the date of his trial. Nor is it because Mr. Spring was found guilty of a technical violation of the criminal law. To the contrary, from a policy viewpoint, the Court is comfortable that the people of this Country, especially Mr. Spring's immediate neighbors and the teenage boys in his community, would be safer if Mr. Spring, with his psychoses, paranoia, and delusions, were barred from purchasing a firearm to defend his property from imaginary trespassers and if the police had the authority to take his guns from him. The unquestioned wisdom of preventing mentally ill individuals from purchasing firearms and ammunition is forcefully brought home in the terrible tragedies that periodically take place in this Country when paranoid or psychotic persons gain access to firearms.

Furthermore, in *Heller*, the Supreme Court itself was careful to observe that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill," *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and in *Rehlander*, the First Circuit did not question the wisdom of Congress's determination that those who are mentally ill should be prohibited from purchasing firearms, *Rehlander*, 666 F.3d at 48 ("[t]he Supreme Court made clear in *Heller* that its decision did not undercut traditional restrictions on the possession of arms by those who were mentally ill"). Rather, the *Rehlander* Court was concerned with the absence of due process under Maine statutory law before a person like Mr. Spring is deprived of the constitutional right to bear arms. *Id.* at 48-49. In keeping with this precedent, the Court readily concludes that Mr. Spring and those around him would be safer and better off if he did not have the right to bear arms and, but for *Rehlander*, the Court would not hesitate to issue a judgment that constrained that right for Mr. Spring.

The *Heller* Court left much unanswered. However, there is no suggestion that the Supreme Court's or the First Circuit's interpretation of the Second Amendment allows the potential purchaser of a firearm to lie about his mental health history on an ATF form. *See, e.g., United States v. Knight*, 574 F. Supp. 2d 224, 226 (D. Me. 2008) ("*Heller* certainly does not eliminate the crime of false statements"). The *Rehlander* Court addressed the extent of the due process required to prohibit firearm possession, but the First Circuit did not eliminate the crime of false statements, and Mr. Spring's argument that *Rehlander* directly

13

removes his false statement liability because of the changing nature of the right to bear arms necessarily fails.

The Court's disquiet is based on the principle that when the First Circuit announces a change in the criminal law that grants additional individual rights based on an application of a Supreme Court interpretation of the United States Constitution, the persons whose cases are pending at the time of the decision should benefit from the more expansive reading of individual rights. But for these convictions, if Mr. Spring were today to proceed to a licensed firearms dealer, he could legally answer "no" to the "have you been committed" question and legally purchase a firearm. Why then should he remain convicted of a crime, which would not be a crime if he committed the same act today?

The answer to this question depends on how the courts apply changes in constitutional interpretation. If Mr. Spring's case were over, he would have a difficult time persuading a court that the criminal judgment should be set aside because of a new constitutional doctrine. However, in Mr. Spring's case, the Court's judgment was not final on January 13, 2012, when the First Circuit issued *Rehlander*, and it seems harsh to hold Mr. Spring to the letter of a law that after the decision would clearly apply to similarly situated individuals. *See Teague v. Lane*, 489 U.S. 288, 300 (1989) ("once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated"). The Court turns, then, to the

question of how the courts apply a decision announcing a new constitutional doctrine.

"Generally speaking, where the Supreme Court announces 'a new rule, that rule applies to all criminal cases still pending on direct review." *United States v. Thomas*, 627 F.3d 534, 537 (4th Cir. 2010) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004)).  Even for cases not on direct review, a new substantive rule will apply retroactively; new substantive rules are those where the scope of a criminal statute is narrowed by interpreting its terms or where "constitutional determinations [] place particular conduct or persons covered by the statute beyond the State's power to punish." *Schriro*, 542 U.S. at 351-52.  The Supreme Court's decision in *Heller* was one such new substantive rule, affording an individual right to bear arms not previously acknowledged by the Court and the First Circuit's decision in *Rehlander*, which flowed from *Heller*, also afforded an individual a basic range of due process rights before his Second Amendment rights are foreclosed.

Under Supreme Court precedent, Mr. Spring's case is not yet final.  *Clay v. United States*, 537 U.S. 522, 527 (2003) ("[f]inality attaches when [the Supreme Court] affirms a conviction on the merits on direct review or denies a petition for writ of certiorari, or when the time for filing a certiorari petition expires").  Applying this definition to Mr. Spring, the case against him is still pending and a new rule would apply.  The *Rehlander* Court announced such a new rule.  Under *Chamberlain*, a class of persons—namely, individuals who had been subject to an emergency involuntary psychiatric admission under Maine law—were required to

reveal on the ATF form that they had been "committed" to a mental health institution; since *Rehlander*, "particular conduct or persons covered by the statute"—namely, those same people—are "beyond the [Government's] power to punish." *Schriro*, 542 U.S. at 352

Although distinctions may be made between unlawful possession and making a false statement in connection with the acquisition of a firearm, in *Rehlander*, the First Circuit reversed the convictions for both Nathan Rehlander and Benjamin Small, each of whom had been convicted for possessing firearms after having been "committed to a mental institution." *Rehlander*, 666 F.3d at 46, 50-51. These men violated the law by possessing the firearms under *Chamberlain* because they had been "committed to a mental institution" under § 922(g)(4), but in *Rehlander*, the First Circuit concluded that because their admissions were not commitments, they had not violated the law against possession by a person so committed. *Id.* at 50. Here, Mr. Spring is a step removed from actual possession, but the same principle applies. As a consequence of *Rehlander*, neither Mr. Rehlander nor Mr. Small is guilty of actual possession of a firearm by a person who had been committed to a mental institution because the First Circuit's reading of the United States Constitution dictates that they had not been committed. The same principle should apply to Mr. Spring and he should not stand convicted of saying he was not committed when, under *Rehlander*, he has not. Based on *Schriro* and *Rehlander*, the Court applies *Rehlander*'s change to the definition of "commitment" to Mr. Spring's case and grants the Defendant's third motion for acquittal.

## IV. CONCLUSION

The Court GRANTS the Defendant's Renewed Motion for Judgment of Acquittal (Docket # 146).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of August, 2012